UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) | Mag. No. 14-6022-LTS |
|  | ) ) ) | |
| FATHALLA MASHALI | ) ) ) | |

MEMORANDUM AND ORDER ON MOTION FOR DETENTION

February 19, 2014

SOROKIN, C.M.J.

The United States requests detention of the Defendant Fathalla Mashali arguing he poses a risk of flight under 18 U.S.C. 3142(f)(2)(A).  The defendant may be detained only if the Government establishes, by clear and convincing evidence, that the defendant is a danger to the community or, by a preponderance of evidence, that he poses a serious risk of flight.  18 U.S.C. § 3142; United States v. Salerno, 481 U.S. 739 (1987); United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991).

## FACTS[1]

Dr. Mashali was born in Egypt in 1954.  In 1978, he earned a medical degree from Cairo University and, sometime thereafter, came to the United States.  Presently, he is a lawful permanent resident of the United States.  In 1993, he married his wife, Dr. Noha (nee Elkadray) Mashali in Massachusetts.  In 1994, he received a fellowship from the University of

---

[1] The facts are drawn from the Pretrial Report containing verified and unverified information as well as the testimony of the FBI agent, documentary exhibits and proffers from defense counsel.

Pennsylvania. From 1995 to 1999, he served in the United States Army Reserve at the rank of Captain. At the conclusion of this service, the Army awarded him an honorable discharge. For at least the last thirty years, Dr. Mashali has lived in the United States, almost entirely in Massachusetts since his marriage.

For some number of years, but apparently beginning no later than the early 2000s, Dr. Mashali operated his own medical practice consisting of some number of medical pain management clinics. He was the only licensed doctor practicing in these clinics. During this period, Dr. Mashali exhibited signs of substantial financial success. In 2004, he and his wife purchased a home in Dover with a mortgage of $900,000. In 2005, they purchased another home in Dover, this time with a mortgage of $1.7 million. In those same years, they purchased, with a partner, two condominiums in Fort Lauderdale, Florida for $535,000 and $820,000, respectively. Each of the Florida properties was purchased with a down payment of approximately twenty-five percent with the remainder financed by a purchase mortgage. They also purchased a property in Lincoln, Massachusetts during this period. The Mashalis continue to own all of these properties, most of which are rental properties, though counsel reports that they are cross-collateralized with little overall equity.

While the record does not reveal the size of Dr. Mashali's medical practice during this period, counsel suggests it employed a large number of staff, perhaps exceeding 100 persons. Dr. Mashali's wife continued to work as a periodontal dentist during this period, but, according to counsel, her efforts were more focused on their growing family. In 2008, Dr. Mashali filed for personal bankruptcy. He listed debts of $12 million. He owed $6 million to the United States Department of Labor for sums Dr. Mashali withheld from his employees, but failed to pay over

2

to the United States per the testimony of the FBI agent. The Bankruptcy Court discharged Dr. Mashali's bankruptcy in June of 2011. Of course, the discharge left intact the debt to the Department of Labor.

Shortly after the discharge in June 2011, Dr. Mashali's wife purchased a home for their family in Dover. It cost $2.2 million with a mortgage of $1.7 million. After the purchase, the Mashalis embarked on a substantial improvement of the property, adding a four car garage, carriage house with a squash court and twenty-seat theatre, pool with patio and kitchen, heated driveway, finished basement, and gate. These improvements cost approximately $2 million, with Dr. Mashali's business paying for "much" of the improvements, according to the testimony. Dr. Mashali and his wife reside in this home along with their four children, ages 16, 14, 11, and 2 ½. Each of their children attends private school. Dr. Mashali's wife owns four luxury SUVs: a Mercedes G550, a Porsche Cayenne, an Audi Q5, and a Lexus GX570, all of which are model year 2011 or newer.

In July of 2012, four employees of Dr. Mashali (each either a Physician Assistant or Registered Nurse) wrote a letter to the DEA, the FBI, and the state Board of Medicine alleging that Dr. Mashali was engaging in "unprofessional, unethical, and unlawful behavior." Specifically, they alleged he was (a) prescribing high-dose narcotics to patients who were clearly drug-seekers or whose ailments did not warrant that type of treatment; (b) fraudulently billing for physical examinations that never took place or for physical examinations at a higher rate than appropriate; and (c) causing patient files to be edited in order to support his fraudulent billing practices. The present investigation commenced.

In 2012, Dr. Mashali traveled to Egypt twice: once in September and then again in November.  Each time, he made his flight reservations well in advance, in April and September, respectively.  In the period 2009 to 2012, Dr. Mashali's wife traveled to Egypt at least nine times.

In 2013, Dr. Mashali encountered significant difficulties.  The Rhode Island Board of Medicine commenced an investigation into the deaths of seven patients who were under his care at the time of their deaths.  In the summer of 2013, the Board concluded Dr. Mashali provided substandard care in six of the cases and revoked his license.  Shortly thereafter, Dr. Mashali voluntarily turned in his Massachusetts medical license and his DEA registration, which is required in order to prescribe controlled substances.  At that point, his ability to practice medicine ceased.

On September 19, 2013, federal agents searched the three clinic offices operated by Dr. Mashali in Massachusetts and his one office in Rhode Island.  The evidence submitted in support of the criminal complaint, as described in the affidavit of the FBI agent, describes a pain clinic mill—Dr. Mashali would often book 150 patients in one day, charge for lengthy patient examinations (e.g. twenty to twenty-five minutes), and conduct only brief office meetings (rather than the reported examinations).  After losing his medical license, Dr. Mashali continued to operate his clinics for a brief period with a succession of hired doctors, however, each quickly left the practice.  The clinics are now closed and he has stopped paying the external medical records provider to maintain copies of his clinic's medical files.

Beginning in September of 2013, Dr. Mashali, according to defense counsel, began drawing $7,000 per week from Egypt to himself in the United States in an effort to replace the

income he lost from his practice. He used these funds to support his family and pay his lawyers. Recently, again according to counsel, Dr. Mashali stopped receiving the funds. Thus, per counsel, Dr. Mashali went to Egypt to recover his investment. On February 7, 2014, he purchased a round-trip ticket to Egypt. On February 8, the FBI arrested Dr. Mashali at Logan Airport as he prepared to board his flight to Egypt.

Dr. Mashali had a number of items of note on his person: a general medical job reference letter written by his nephew; copies of his medical specialty certifications; a set of passport photos of his wife in a photo card; and another passport photo card with space for two photos but that only contained one photo of Dr. Mashali. After his arrest, in response to questions, he said he has suicidal ideation daily, and he went to Egypt to see his sick sister. He also reported he wanted to die in Egypt and be buried with his parents—whether Dr. Mashali meant he intended to die on this trip or expressed a more generalized wish, the testifying agent candidly admitted he was not sure.

Several other financial facts are relevant. First, Dr. Mashali's wife earned $150,000 in business income from her practice in 2012. Defense counsel's proffers regarding her professional activities support only one reasonable inference: that in most or all of the prior years she earned less, as counsel indicates she is now building up her practice to supplement the family income after spending some number of years focused more on raising the couple's children. Second, from at least as early as February of 2009 until May of 2013 (thus during and after the bankruptcy), Dr. Mashali wired a significant amount of money to Egypt and Cyprus—$1.7 million in total. In May 2012, on the same day, he sent two wires totaling $370,000 from his wife's account to New Urban Communities Development Company in Egypt, which operates a

residential development aimed at wealthy Egyptians living outside of Egypt. Whether the Bankruptcy Court knew of and authorized these transfers is not clear on the present record though that would seem doubtful.

## LAW

In making the determination whether "any condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community," the Bail Statute directs consideration of the following factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . .

18 U.S.C. § 3142(g).

## DISCUSSION

Several facts remove this case from the ordinary situation of a long-time Massachusetts resident facing a non-violent criminal charge. On very short notice (one day), Dr. Mashali purchased a plane ticket to leave the country. When he attempted to go to Egypt, Dr. Mashali

had lost his license to practice medicine for providing substandard care resulting, in some measure, in the deaths of six patients, and he had seen his ability to earn income in the United States essentially wiped out.  Presumably, however, the decisions of Massachusetts and Rhode Island medical boards do not impair his ability to practice medicine overseas.  In addition, he knew he was the target of an ongoing federal criminal investigation.  That he had previously wired approximately $1.7 million to Egypt for, among other purposes, the purchase of a home, further heightens the risk of non-appearance presented in this case.  Notably, he carried with him a general letter of reference for employment along with copies of his medical certifications.  All of the foregoing suggests Dr. Mashali left for Egypt to find employment as a medical doctor to support his family.

     Mashali seeks to offset these risks with two key conditions: (1) home detention on the electronic bracelet and (2) the posting of the family residence, representing approximately $2 million in equity.  On the present, limited record, the Court cannot attribute significant weight to the posting of the home.  Considering the amount of money Mashali possessed, the allegations of financial misconduct and the various claims against him, I cannot conclude that the equity in the property is a significant asset that would materially secure his appearance.  While the house is the family residence (thus with a possible significance separate from the home's financial value), it has been so for only a relatively short period of time, approximately three years, and the family has the income, if not the assets, to secure alternative suitable housing if the home were lost.  No other conditions of release addressing the risk of flight are readily apparent to the Court.

     In these circumstances on this record, I find that the Government has established by a preponderance of the evidence that Dr. Mashali poses a serious risk of flight.

## ORDER OF DETENTION PENDING TRIAL

In accordance with the foregoing memorandum, IT IS ORDERED:

1. That Fathalla Mashali be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That Fathalla Mashali be afforded a reasonable opportunity for private consultation with counsel; and

3. That on order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Fathalla Mashali is detained and confined shall deliver Fathalla Mashali to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

SO ORDERED.

    /s / Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge